## UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| (1) THE DAVID A. KROLL, INC. EMPLOYEES' PROFIT-SHARING PLAN AND TRUST, derivatively on behalf of CHESAPEAKE ENERGY CORPORATION,<br><br>                              Plaintiff,<br><br>v.<br><br>(1) AUBREY K. MCCLENDON, (2) RICHARD K. DAVIDSON, (3) V. BURNS HARGIS, (4) FRANK A. KEATING, (5) BREENE M. KERR, (6) CHARLES T. MAXWELL, (7) DON L. NICKLES, (8) FREDERICK B. WHITTEMORE, (9) MARCUS C. ROWLAND, (10) MICHAEL A. JOHNSON, (11) LOUIS A. SIMPSON, (12) KATHLEEN M. EISBRENNER, and (13) MERRILL A. MILLER, JR.,<br><br>                              Defendants,<br><br>and<br><br>(1) CHESAPEAKE ENERGY CORPORATION, | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | **JURY TRIAL DEMANDED** |

Nominal Defendant.

### VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1.      Plaintiff, The David A. Kroll, Inc. Employees' Profit-Sharing Plan and Trust ("Plaintiff"), by and through its undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, for the benefit of nominal defendant Chesapeake Energy Corporation ("Chesapeake" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment from 2009 to the present (the "Relevant Period").

## NATURE OF THE ACTION

2.       Chesapeake is the third largest independent producer of natural gas in the U.S. According to its public filings, Chesapeake's strategy is focused on discovering, acquiring and developing conventional and unconventional natural gas reserves onshore in the U.S., east of the Rocky Mountains.   As of December 31, 2010, the Company had interests in approximately 45,800 gross productive wells, and the Company's proved reserves include 17.096 trillion cubic feet of natural gas equivalent.   For years, the Board has allowed Aubrey K. McClendon ("McClendon"), the Company's longtime Chairman of the Board and Chief Executive Officer ("CEO")[1], to run the Company for his own tremendous benefit at the expense of the Company's shareholders.   Conflicts of interest have risen to level of an art form at Chesapeake as McClendon's latest gambit illustrates.

3.       Since at least 2009, defendants (and the Board, in particular) have repeatedly "bailed out" and come to the defense of defendant McClendon, regardless of the circumstances. Unfortunately for shareholders, as alleged herein, these "bail outs" have come at the direct expense of the Company.   Compounding their treatment of McClendon, during this time, the Board has consistently and systematically failed to disclose material information to Company stockholders.   This litany of false and misleading statements has significantly damaged the Company and its stockholders.

4.       Although nominally a public corporation, the Board and McClendon have run Chesapeake as McClendon's private fiefdom for years.   The most recent example of this is the belated disclosure that McClendon is personally responsible for more than $1.1 billion in debts (collateralized by his interest in Chesapeake's gas wells, at a time when the price of natural gas

---

[1] On or about May 1, 2012, it was announced that McClendon would relinquish his role as Chesapeake's Chairman, but would remain as the Company's CEO.

has collapsed) to, among others, a private equity firm, EIG Global Energy Partners ("EIG"), which has been purchasing Chesapeake assets.  McClendon has amassed this enormous debt even though the Board has paid him more than $220 million over the last ten years.  This latest disclosure has caused the market to not only doubt McClendon's ability to retire his debt, but to call into question Chesapeake's overall business strategy, which centers upon this issue: is the Company run for McClendon's benefit (even though he currently owns less than 1% of the Company's stock), or is it run for the other 99% of shareholders, who collectively hold more than 635 million shares of Chesapeake stock.

5.     On April 18, 2012, a *Reuters* article entitled "Chesapeake CEO Took Out $1.1 Billion in Unreported Loans" (the "*Reuters* Article") revealed that defendant McClendon has borrowed as much as ***$1.1 billion*** over the last three years against his stake in thousands of Company wells.  These loans, which (like the Company's prior problems) were not previously disclosed  to shareholders in any  Company financial filings, were  used to finance defendant McClendon's operating costs associated with the controversial Founders Well Participation Program (the "Founders Program").  The Founders Program --  perhaps, the most lavish incentive compensation scheme ever devised and enacted at a public corporation -- grants defendant McClendon, and him alone, the opportunity to personally obtain a 2.5 percent stake in the "profit" of every well the Company drills.  Critically (and also unbeknownst to shareholders), defendant McClendon was using his 2.5 percent interest in the wells as collateral for the loans he used (and in fact needed) to participate in the Founders Program and obtain his interest in the wells in the first place because pursuant to the Founders Program he was required to pay 2.5 percent of the costs of operating the wells.

6.     Notably, the natural gas market (and, in turn, the Company's stock price) has

cratered in recent years.  For instance, a March 9, 2012 *CNNMoney* article entitled "Natural Gas Prices Hit 10-Year Low" found that "[n]atural gas future prices hit a 10-year low Thursday as slack demand and rising production continued to fuel and oversupply of product."  Critically, on defendant McClendon's watch, the price of the Company's stock has followed the collapse of natural gas prices.  For instance, the price of the Company's stock has declined  from around $67 per share in July 2008 to its current level of around $17.50 per share, representing a decrease of almost 74% in under four years' time.

7.     More egregiously, according to the *Reuters* Article, McClendon's biggest personal lender for these loans, EIG, has also been one of the Company's largest financers and a purchaser of interests in Company assets worth potentially billions of dollars.  For instance, in November 2011, Chesapeake raised $1.25 billion from a group of investors including EIG through the sale of "perpetual preferred shares" in a newly formed entity, Chesapeake Utica LLC, which controls about 800,000 acres of oil and gas-rich land in Ohio.  Further, the sale offered lucrative terms to EIG, paying an annual dividend of 7 percent and royalty interests from oil and gas wells.  As reported in the April 18, 2012 *Wall Street Journal* article entitled "For Chesapeake's CEO, a Complex Web of Loans" (the "WSJ Article") firms controlled by defendant McClendon were in debt to EIG for more than a billion dollars while Chesapeake was negotiating with EIG to sell it hundreds of millions of dollars of assets, a dramatic, undisclosed conflict of interest.

8.     Similarly, on April 9, 2012, the Company announced a nearly identical deal to raise another $1.25 billion from EIG and other investors.  Thus, EIG is not only financing defendant McClendon's private deals, but is also simultaneously purchasing assets from Chesapeake and investing in Company assets.  Incredibly, even in light of the Judge DeGiusti's

ruling and outcry over the map fiasco, defendants failed to disclose these material relationships in any Company filings.

9.      Most tellingly, even though the market has become accustomed to the defendants' belated and incomplete disclosures, the price of the Company's stock fell to a close of $18.06 per share on April 18, 2012, down from a close of $19.12 per share on April 17, 2012, representing a one-day decline of over 5.5%.  Public reaction to this news was quick and severe.  For instance, David Dreman, Chairman of Dreman Value Management LLP, which owns about 1 million shares of Company stock was quoted as saying that McClendon's "business ethics are out of the Wild West" and that "the whole management and the board of directors has to be cleaned up."

10.      On April 19, 2012, in response to the allegations contained in the *Reuters* Article, defendants came running to the defense of defendant McClendon and actually admitted that the Board was "fully aware of the existence of Mr. McClendon's financing transactions."  Notably, defendants also claimed that these transactions were "disclosed" to shareholders because of two vague references contained in the Company's Proxy Statement filed with the SEC on Form DEF 14A on April 29, 2011 (the "2011 Proxy").  This Board simply does not understand the disclosure rules, or what it means to be a fiduciary.

11.      Thus, because the Board was "fully aware of the existence of Mr. McClendon's financing transactions" and because the Board has steadfastly come to his defense, no reasonable stockholder would reasonably believe that this same Board would then be able to independently consider a demand in good faith concerning these very same matters in good faith.  Stated another way, the Board has already publicly refused to take the exact actions that would be contained in a shareholder demand, thus any demand on the Board clearly would be futile.

12.      Despite defendants' claim that McClendon's loans are "disclosed" to Company

shareholders merely because of two references in the 2011 Proxy, none of the Company's proxy statements or other SEC filings discloses the number, amounts, or terms of McClendon's loans. As stated in an April 18, 2012 *Forbes* article entitled "Chesapeake Energy:  CEO McClendon Serves Himself First," "[y]ou have to wonder whether [the Board] and General Counsel Henry Hood have been overcome by fumes.  ***The company's response to inquiries from Thomson Reuters' special investigation by Brian Grow and Anna Driver is not only disingenuous it's borderline delusional***."

13.    Predictably, as a result of defendants' most recent string of omissions, the Company has come under fire from the financial press for the failure to disclose the material fact that, as a result of these loans, defendant McClendon is now obtaining a benefit not shared with Chesapeake shareholders.  For instance, a *Seeking Alpha* article dated April 19, 2012 entitled "Chesapeake Response to CEO Loan Scandal is Lacking" noted that because the "collateral" for the loans needed for the wells was actually the 2.5 percent interest in wells, defendant McClendon was incurring no risk whatsoever.  If the wells were not producing enough for McClendon to cover his payments on the loans, then the only thing McClendon would lose was his 2.5 percent stake in a given  non-producing well.  The article likewise noted that because defendant McClendon incurred essentially zero risk in a failed well, he was incentivized to drill as many wells as possible (as the Company has done over the past three years).

14.    While the Board admitted on April 19, 2012 that it was "fully aware of the existence of Mr. McClendon's financing transactions,"  the Board completely changed its story on April 26, 2012, claiming that it "did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions."

15.    According to the *WSJ* Article, in 1994 (the first full year of the Founders

Program), the Company drilled only 18 wells.  Today, the Company is drilling more than 1,000 wells per year.  Critically, as discussed previously, this increase in the well drilling was occurring during a time that natural gas prices were plummeting because of the supply available, which begs the question as to whose interest the newly drilled wells were actually serving?  Did McClendon believe that Chesapeake's dramatically enhanced drilling program was in stockholders' best interests, or was he merely "doubling down" with borrowed money to avoid financial ruin?

16.    Accordingly, it is clear that defendants simply are unwilling to comply with their fiduciary duties; they will not manage the Company for the benefit of 99% of its shareholders, nor will they truthfully, completely and candidly disclose material information to Company shareholders.  Thus, as a result of defendants' multiple breaches of duties, the Company has been damaged, and it is subject to further, material damages.

17.    In connection with the activities described, *supra*, Chesapeake is now being investigated by the Securities and Exchange Commission ("SEC") and the Internal Revenue Service ("IRS").  On April 26, 2012, the defendants caused Chesapeake to announce that it "does not intend to extend the company's Founder Well Participation Program … beyond its present 10-year term ending December 31, 2015."

## JURISDICTION AND VENUE

18.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(a) because a

substantial portion of the transactions and wrongs complained of herein, including defendants' participation in the wrongful acts detailed herein, occurred in this District and Chesapeake maintains its corporate headquarters in this District.  Further, defendants either reside in or maintain executive offices in this District, and/or have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## THE PARTIES

20.     Plaintiff holds 8,810 shares of Chesapeake stock, and has continuously held Chesapeake stock since July 2008.

21.     Nominal defendant Chesapeake is an Oklahoma corporation headquartered in Oklahoma City, Oklahoma.  According to its public filings, Chesapeake's strategy is focused on discovering, acquiring and developing conventional and unconventional natural gas reserves onshore in the U.S., east of the Rocky Mountains.

22.     Defendant McClendon has served as Chairman of the Board and CEO of the Company since co-founding Chesapeake in 1989.  On or about May 1, 2012, it was announced that McClendon would relinquish his role as Chesapeake's Chairman, but would remain as the Company's CEO.

23.     Defendant Marcus C. Rowland ("Rowland") served as the Company's Executive Vice President from 1998 to November 2010 and as its Chief Financial Officer ("CFO") from 1993 until November 2010.

24.     Defendant Michael A. Johnson ("Johnson") has served as the Company's Senior Vice President of Accounting, Controller and Chief Accounting Officer since 2000.

25.     Defendant Richard K. Davidson ("Davidson") has served as a director of the

Company since 2006.  In addition, defendant Davidson has served as a member of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.

26.     Defendant Frank  Keating ("Keating") has served as a director of the Company since 2003.

27.     Defendant Breene M. Kerr ("Kerr") served as a director of the Company from 1993 until 2009.  Further, defendant Kerr served as a member of the Audit Committee during the Relevant Period.

28.     Defendant Charles T. Maxwell ("Maxwell") has served as a director of the Company since 2002.

29.     Defendant Merrill A. "Pete" Miller, Jr. ("Miller") has served as a director of the Company since 2007.  In addition, defendant Miller has served as a member of the Audit Committee during the Relevant Period.

30.     Defendant Don L. Nickles ("Nickles") has served as a director of the Company since 2005.

31.     Defendant V. Burns Hargis ("Hargis") has served as a director of the Company since September 2008.  In addition, defendant Hargis has served as a member of the Audit Committee during the Relevant Period.

32.     Defendant Frederick B. Whittemore ("Whittemore") served as a director of the Company from 1993 until June 2011.

33.     Defendant Kathleen M. Eisbrenner ("Eisbrenner") has served as a director of the Company since 2010.

34.     Defendant Louis A. Simpson ("Simpson") has served as a director of the Company since 2011.

35. Collectively, defendants McClendon, Rowland, Johnson, Davidson, Keating, Kerr, Maxwell, Miller, Nickles, Hargis, Eisbrenner, Simpson, and Whittemore shall be referred to herein as "Defendants."

36. Collectively, defendants Davidson, Hargis, Kerr and Miller shall be referred to as the "Audit Committee Defendants."

## DEFENDANTS' DUTIES

37. By reason of their positions as officers, directors, and/or fiduciaries of Chesapeake and because of their ability to control the business and corporate affairs of Chesapeake, Defendants owed Chesapeake and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage Chesapeake in a fair, just, honest, and equitable manner. Defendants were and are required to act in furtherance of the best interests of Chesapeake and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Chesapeake and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

38. Defendants, because of their positions of control and authority as directors and/or officers of Chesapeake, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Chesapeake, each of the Defendants had knowledge of material non-public information regarding the Company.

39. To discharge their duties, the officers and directors of Chesapeake were required to exercise reasonable and prudent supervision over the management, policies, practices and

controls of the Company.  By virtue of such duties, the officers and directors of Chesapeake were required to, among other things:

    a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

    b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c.  When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

40.    Pursuant to the Audit Committee's Charter, the members of the Audit Committee are required, *inter alia*, to:

    a.  Discuss with management any major issues as to the adequacy of the Company's internal controls;

    b.  Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control those exposures;

    c.  Discuss with management the guidelines and policies to govern the process by which risk assessment and risk management is undertaken;

    d.  Discuss with management the Company's earnings press releases and earnings guidance provided to analysts and ratings agencies;

    e.  Review, prior to filing, the Company's annual and quarterly reports;

    f.  Oversee any legal, compliance or regulator issues that could have a material effect on the Company's financial statements or compliance policies; and

    g.  Investigate material matters brought to the committee's attention within the scope of its duties.

41.    Pursuant to the Founder's Program, the program "fosters and promotes the development and execution of the Company's business by…***imposing on the Founders the same risk incurred by the Company in its core operations***."

## SUBSTANTIVE ALLEGATIONS

A.      **Background of the Company and Its Business**

42.      Chesapeake was founded in 1989 by defendant McClendon.  According to its public filings, Chesapeake engages in the acquisition, development, exploration, and production of natural gas and oil properties in the U.S.  It also provides marketing and other midstream services.

43.      The Company's properties are located in Alabama, Arkansas, Colorado, Kansas, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Montana, Nebraska, New Mexico, New York, North Dakota, Ohio, Oklahoma, Pennsylvania, Tennessee, Texas, Utah, Virginia, West Virginia, and Wyoming. As of December 31, 2010, Chesapeake had interests in approximately 45,800 gross productive wells and its proved reserves include 17.096 trillion cubic feet of natural gas equivalent.

44.      Critically, from 2008 until the present, the amount of Chesapeake stock held by McClendon steadily decreased from around 5.5% in 2008 to less than 1% in 2012.  Notably, despite defendant McClendon's vastly dwindling share in Company stock, Defendants (and the Board, in particular) have "bailed him out" time and time again, despite awarding him hundreds of millions in compensation during this same time frame.

B.      **Defendants Fail to Disclose Material Facts Concerning McClendon's Loan Agreements**

45.      On April 18, 2012, the *Reuters* Article was published and revealed that defendant McClendon has borrowed as much as ***$1.1 billion*** over the last three years against his stake in thousands of Company wells.  The loans, which were previously undisclosed  in  Company financial filings, were used to fund defendant McClendon's operating costs associated with the Founders Program, which offers him a chance to invest in a 2.5 percent interest in every well the

Company drills.  Critically (and likewise unbeknownst to shareholders), defendant McClendon was using his 2.5 percent interest in the wells as his collateral for the loans he needed to invest in the wells in the first place because pursuant to the Founders Program he was required to pay 2.5 percent of the costs for operating the wells.

46.     As discussed above, pursuant to the Founder's Program, the program "fosters and promotes the development and execution of the Company's business by…imposing on the Founders the same risk incurred by the Company in its core operations."  Given that defendant McClendon did not share in any of the risks and was personally motivated to drill as many wells as possible for his own financial problems, it is clear that his actions are in direct conflict with the goals of the Founder's Program.

47.     More egregiously, according to the *Reuters* Article, McClendon's biggest personal lender for these loans, EIG, is and has been, one of the Company's largest financers. For instance, in November 2011, Chesapeake raised $1.25 billion from a group of investors including EIG through the sale of "perpetual preferred shares" in a newly formed entity, Chesapeake Utica LLC, which controls about 800,000 acres of *oil and gas*-rich land in Ohio. Further, the sale offered lucrative terms to EIG investors, paying an annual dividend of 7 percent and royalty interests from oil and gas wells.  Considering that EIG holds some or all of McClendon's loans, this EIG transaction presented a massive conflict of interest, and it should have been timely disclosed.

48.     Similarly, on April 9, 2012, the Company announced a "nearly identical deal" to raise another $1.25 billion from EIG and other investors.   Not only is EIG financing defendant McClendon's private deals, but it is also simultaneously investing in Company assets.  The Board, amazingly, did not disclose these material conflicts of interest; rather, perhaps it is un-

amazing considering this Board's well-known, long-term proclivity from hiding the truth, especially when it concerns McClendon.

49.     The *Reuters* Article also stated, in pertinent part:

McClendon has borrowed as much as $1.1 billion in the last three years by pledging his stake in the company's oil and natural gas wells as collateral, documents reviewed by Reuters show.

The loans were made through three companies controlled by McClendon that list Chesapeake's headquarters as their address. The money is being used to help finance what could be a lucrative perk of his job - the opportunity to buy into the very same well stakes that he is using as collateral for the borrowings.

The size and nature of the loans raise concerns about whether McClendon's personal financial deals could compromise his fiduciary duty to Chesapeake investors, according to more than a dozen academics, analysts and attorneys who reviewed the loan agreements for Reuters.

"If Mr. McClendon has $1 billion in debt through his own companies — companies operating in the same industry as Chesapeake — he has or could have a high degree of risk for conflicts of interest. As in, whose interest will he look out for, his own or Chesapeake's?" said Joshua Fershee, an associate professor of energy and corporate law at the University of North Dakota.

The revelation of McClendon's bout of borrowing comes as he is scrambling to help Chesapeake avert a multi-billion-dollar cash shortfall amid a plunge in natural gas prices.

It also exposes a potentially serious gap in how U.S. regulators scrutinize corporate executives, a decade after those rules were tightened in the wake of major accounting scandals.

The loans portend a number of possible problems, the analysts said. McClendon's biggest lender is simultaneously a major investor in two units of Chesapeake. That connection raises questions about whether Chesapeake's own financing terms could be influenced by its CEO's personal borrowing.

Another concern: A clause in the deals requires McClendon "to take all commercially reasonable action" to ensure that other owners and operators of the wells - including Chesapeake - "comply with...covenants and agreements" of the loans. Such clauses are common in energy-finance deals. But it is rare for the CEO of a major energy company to be personally subject to one involving the corporation that he runs. That means McClendon could have an incentive to influence Chesapeake to act in the interest of his lenders, rather than of his shareholders.

"Basically what you have here is a private transaction that could potentially impact a public company, depending on the manner in which the clause is interpreted and applied," says Thomas O. Gorman, a partner at law firm Dorsey & Whitney in Washington, D.C., and a former special trial counsel at the Securities and Exchange Commission (SEC). "That may create a conflict of interest."

As a result, the loans should have been fully disclosed to Chesapeake shareholders, the academics, attorneys and analysts said.

*     *     *

Less than four years ago, a personal transaction by McClendon did negatively influence the company.

To buy more Chesapeake stock, McClendon borrowed money from his brokers - what's called "buying on margin." In October 2008, just after the financial crisis erupted with the bankruptcy of Lehman Brothers, he was forced to sell more than 31 million Chesapeake shares for $569 million to cover margin calls from those brokers. The company's stock fell nearly 40 percent the week of McClendon's share sales. McClendon issued an apology but the company's credibility with many shareholders suffered significantly.

Chesapeake's board of directors is aware that McClendon has borrowed against his share of company wells, Hood said, but "the board did not review or approve the transactions." Nor did the company vet the loan terms for possible conflicts. "If there were any conflicts of interest," Hood said, "they would have surfaced by now."

Chesapeake board members contacted declined to comment. Marc Rome, Chesapeake's vice president for corporate governance, did not respond to requests for comment.

**Well investment plan**

The loans reveal how McClendon is using an unusual corporate incentive as collateral. The perk, known as the Founder Well Participation Plan, grants Chesapeake's billionaire co-founder a 2.5 percent stake in the profits - and makes him pay 2.5 percent of the costs - of every well drilled during each year he decides to participate.

Today, Chesapeake is the only large publicly traded energy company to grant its CEO the opportunity to take a direct stake in wells it drills. Chesapeake says the well plan is a uniquely powerful incentive because it aligns McClendon's personal interests with those of the company's.

The well plan does not allow McClendon to select the wells in which to invest; Chesapeake says the program is an all-or-nothing proposition so that McClendon can't cherry-pick only the most profitable wells.

"He has to eat his own cooking here," said company spokesman Michael Kehs. But because McClendon is using the loans to finance his participation in the well plan, he defrays his risks. Two of McClendon's lenders, both private equity firms, in turn spread the loan risks to other investors by raising money from state pension funds and other investors to fund them. Those insights emerge from a February 2011 document detailing a meeting between McClendon's largest personal lender and a prospective investor.

"If he hasn't had to put up any of his own money, how is that alignment" of McClendon and Chesapeake's interests, asked Mark Hanson, an analyst with Morningstar in Chicago.

Chesapeake said McClendon's loans are "well disclosed" to company shareholders. General Counsel Hood cited two references in the company's 2011 proxy. In them, the firm refers to McClendon's personal "financing transactions," including one in a section entitled "Engineering Support" that discusses McClendon's use of Chesapeake engineers to assess well reserves.

Nowhere in Chesapeake proxy statements or SEC filings does the company disclose the number, amounts, or terms of McClendon's loans. Veteran analysts of the company said they were never aware of the loans until contacted for this article.

*       *       *

**Through the cracks**

Legal experts say the size and terms of McClendon's borrowing are unusual - and highlight a gap in regulatory scrutiny of American corporate executives.

In the past, major Wall Street banks formed separate companies - or special purpose vehicles, just as McClendon has - to allow select employees to borrow from the employer and make investments. The WorldCom accounting scandal was, in part, fueled by more than $1 billion in loans taken out by former chief executive Bernard Ebbers that were secured by his shares of company stock. And energy giant Enron used off-balance-sheet entities to hide debt from investors. New accounting and corporate governance laws and regulations banned such transactions or required their disclosure.

In September 2006, the SEC revised its related-party transaction rules to require companies to disclose when executives pledged corporate stock as collateral for loans. "These circumstances have the potential to influence management's performance and decisions," the SEC wrote.

McClendon's loans - backed not by stock but by stakes in company wells - aren't covered by the SEC rule. "Because they have decided to compensate him with a business interest, it kind of falls through the cracks," says Francine McKenna, an accounting expert and author of the accounting-related blog re: The Auditors.
As a result, no SEC regulation precludes McClendon from using his well plan stake as loan collateral. The SEC declined to comment on the McClendon loans.

*       *       *

McClendon's close relationship with the board hasn't left him immune to tensions with stockholders.

After Chesapeake's board agreed to buy McClendon's map collection in 2008 for $12.1 million, shareholders sued. The lawsuit was settled in November 2011, when McClendon agreed to refund the $12.1 million, plus interest, and hold stock worth 500 percent of his annual salary and bonus. Chesapeake also agreed to hire Rome, the vice president of corporate governance, and an executive compensation consultant to evaluate corporate pay packages.

The well participation plan, which was approved by shareholders in 2005 and cannot be discontinued until 2015, has remained unaffected.

Disgruntled investors continue to launch challenges. On March 13, New York Comptroller John C. Liu and the $113 billion New York Pension Funds called on Chesapeake to let large long-term shareholders put up their own nominees for the board of directors.

**Untangled**

Key aspects of McClendon's loans remain hidden from shareholders. Because promissory notes underpinning the loan agreements are private, the interest rate, the exact amount borrowed and other terms of the transactions are not publicly known.

But the loan agreements demonstrate the extent to which McClendon has leveraged his interests: He has pledged as collateral almost every asset associated with his share of Chesapeake wells. Oil, gas and land interests, platforms, wells and pipelines, hedging contracts, geological and business data, and intellectual property are among scores of well-related assets that can be seized should McClendon default.

\*       \*       \*

Given the size, scope and complicated terms of the loans, their particulars constitute important stockholder information and therefore should be more fully disclosed, said David F. Larcker, a professor of accounting at Stanford University's Graduate School of Business.

Some shareholders agree. "While recognizing (McClendon's) right to privacy, the more information the company releases to shareholders the better - particularly when it's such a large amount of money and related to the oil and gas business," said Mike Breard, oil and gas research analyst at Hodges Capital Management in Dallas, which owns Chesapeake shares.

**Loan trail**

As with a mortgage on a residential home, state law requires that ownership rights to physical property be recorded with county clerks.

Reuters found McClendon's loan agreements by following the trail of well and land lease transfers from Chesapeake to three companies that list McClendon as their corporate representative, according to state deed records.

In county courts in Louisiana, Texas, Arkansas, Pennsylvania and Oklahoma, where Chesapeake operates thousands of wells, the company regularly files a form called a conveyance. In keeping with the corporation's well participation program, the conveyance grants McClendon a 2.5 percent share of each well and of the leased land on which it is drilled.

For years, Chesapeake has distributed 2.5 percent shares in wells and land to three McClendon-controlled companies - Chesapeake Investments LP, Larchmont Resources LLC and Jamestown Resources LLC.

Since he co-founded Chesapeake in 1989, McClendon has frequently borrowed money on a smaller scale by pledging his share of company wells as collateral. Records filed in Oklahoma in 1992 show a $2.9 million loan taken out by Chesapeake Investments, a company that McClendon runs. And in a statement, Chesapeake said McClendon's securing of such loans has been "commonplace" during the past 20 years.

But in the last three years, the terms and size of the loans have changed substantially. During that period, he has borrowed as much as $1.1 billion - an amount that coincidentally matches Forbes magazine's estimate of McClendon's net worth.

The $1.1 billion in loans during the past three years breaks down this way:
In June 2009, McClendon agreed to borrow up to $225 million from Union Bank, a California lender, pledging his share of wells as collateral.

In December 2010, he borrowed $375 million from TCW Asset Management, a private equity firm.

And in January 2012, McClendon borrowed $500 million from a unit of EIG Global Energy Partners, a private equity firm formed by former TCW executives. It is unclear how much, if any, of those loans have been repaid.

*     *     *

**Real loss?**

At first blush, what the company tells shareholders suggests the well plan is a money-loser for McClendon.

In its proxy statements, Chesapeake says McClendon lost $116 million in 2009, and $141.9 million in 2010.

It's unclear whether McClendon has suffered any real losses, however. Asked about the calculations, Hood said McClendon's net loss is a byproduct of his drilling costs being "front end loaded," while his revenues accrue over many years.

"If they are showing that kind of negative cash flow, the wells don't have value," said Phil Weiss, oil analyst at Argus Research who has a sell rating on the company's shares. But given that McClendon has borrowed more than $1 billion based on the value of his well stakes, "I really don't think (the company's disclosures) tell me much," Weiss said.

Chesapeake has resisted attempts by regulators to get more information on McClendon's well-participation plan before. In 2008, the SEC requested more information about McClendon's benefits from the well plan as part of a review of the company's 2007 annual report.

From May to October that year, Chesapeake and SEC officials exchanged at least eight letters and held negotiations on the issue. After first refusing to provide more information, Chesapeake ultimately agreed to provide shareholders a chart detailing well plan revenues and costs, a review of the letters shows.

\*      \*      \*

**Big lender**

McClendon's biggest personal lender, EIG, has been a big financer for Chesapeake, too.

In November, Chesapeake raised $1.25 billion from a group of investors including EIG through the sale of "perpetual preferred shares" in a newly formed entity, Chesapeake Utica LLC, which controls about 800,000 acres of oil and gas-rich land in Ohio. The sale offers lucrative terms to EIG investors, paying an annual dividend of 7 percent and royalty interests from oil and gas wells, according to analysts.

On April 9, the company announced a nearly identical deal to raise another $1.25 billion from EIG and other investors, in another new subsidiary called CHK Cleveland Tonkawa.

Dividends on preferred shares are controversial because they are paid before regular dividends owed to common shareholders. "Basically it's a form of more expensive debt," Morningstar's Hanson said. "It makes it appear that it's not debt, but it sits on top of obligations to the common shareholder."

The fact that McClendon's largest personal lender received favorable terms on its Chesapeake investments caused some Wall Street analysts to call for more information about McClendon's loans.

"I think the company should disclose this information. One reason is that the CEO is taking out loans from at least one entity, EIG, which recently provided financing to Chesapeake," said Joseph Allman, oil and gas industry analyst at JPMorgan in New York, who reviewed the loan agreements. "In the same way that investors want to know the counterparty to significant Chesapeake transactions, they would want to know if one of those firms has significant private dealings with the CEO."

Chesapeake's Hood acknowledged there could be "some theoretical possibility of a conflict of interest" with the company and its CEO borrowing from the same lender. But because Chesapeake does not believe there is "an actual conflict of interest," more disclosure is not required, Hood said.

**Closing a gap**

McClendon's personal loans highlight a gap in current SEC rules governing disclosures of related-party transactions, say accounting experts. The SEC requires disclosure of any transaction over $120,000 involving a company and a related party, such as the CEO, directors and certain family members, "with direct or indirect material interest."

Chesapeake said the SEC's related-party rule doesn't apply to McClendon's loans - only to his participation in the well plan. That's because Chesapeake believes the loans "do not constitute a material transaction with Chesapeake or even involve Chesapeake," Hood said.

That disclosure gap may be closing. A proposed new standard, released for public comment by the Public Company Accounting Oversight Board on February 28, would require auditors to identify and evaluate "significant unusual transactions" with executives connected to publicly traded firms. The board defined such transactions as those "outside the normal course of business or that otherwise appear to be unusual due to their timing, size or nature."

*    *    *

For now, said analyst Weiss, Chesapeake and McClendon are pushing the limits. "If Chesapeake were trying to make things muddy and unclear without breaking the law, this would be a good way to do it."

50.     Most tellingly, even though the market has become accustomed to Defendants' belated and incomplete disclosures, the price of the Company's fell to a close of $18.06 per share on April 18, 2012 down from a close of $19.12 per share on April 17, 2012, representing a one-day decline of over 5.5%.

51.     On April 19, 2012, in response to the allegations contained in the *Reuters* Article, Defendants came running to the defense of defendant McClendon and actually admitted that the Board was "fully aware of the existence of Mr. McClendon's financing transactions," but stated there were no conflicts of interest or other improprieties.  The Company's response, delivered by General Counsel Henry J. Hood, is as follows:

The Founders Well Participation Program (FWPP) has been in place since the company's founding and was reapproved by shareholders by a wide margin in 2005. The terms and procedures for the program are clear and detailed in every proxy for all shareholders to see. Mr. McClendon's interests and Chesapeake's are completely aligned. In addition, there are numerous third-party participants in the company's wells, including some of the largest energy companies in the world, that monitor the actions of the company through a number of processes, including well audits, reporting, governmental filings and hearings, participation in development plans and marketing of production. The suggestion of any conflicts of interest is unfounded.

The Board of Directors is fully aware of the existence of Mr. McClendon's financing transactions and the fact that these occur is disclosed in the proxy. Additionally, the total amount of his cost obligations and revenue attributable to the FWPP for each year are detailed in the proxy. The Founders Well Participation Program fully aligns the interests of Mr. McClendon with the company and the Board of Directors supports this program as does the majority of its shareholders.

52.     Accordingly, given that the Board was "fully aware of the existence of Mr.

McClendon's financing transactions" (although choosing not to disclose it) and given that the Board has steadfastly come to his defense, no reasonable stockholder would reasonably believe that this same Board would then be able to independently consider a demand concerning these very same matters in good faith. Stated another way, the Board has already publicly refused to take the exact actions that would be contained in a shareholder demand, thus any demand on the Board clearly would be futile.

53.     Despite Defendants' claim that McClendon's loans are "disclosed" to Company shareholders merely because of two references in the 2011 Proxy, none of the Company's proxy statements or other SEC filings discloses the number, amounts, or terms of McClendon's loans. As reported by *Forbes* in an April 18, 2012 article entitled "Chesapeake Energy:  CEO McClendon Serves Himself First," "[y]ou have to wonder whether Chesapeake Energy's Board of Directors and General Counsel Henry Hood have been overcome by fumes. ***The company's response to inquiries from Thomson Reuters' special investigation by Brian Grow and Anna Driver is not only disingenuous it's borderline delusional***."

54.     Additionally, despite Defendants' contentions to the contrary, as the financial press has repeatedly stated, these ***$1.1 billion*** in loans presents a conflict of interest for defendant McClendon as it relates to the Company.  For instance, an April 19, 2012 *Forbes* article entitled "Why Chesapeake Shareholders Should Worry About McClendon's Big Borrowing" detailed a number of potential conflicts of interest, including:

> The simple truth is that McClendon's well participation perk does not align his interests with those of shareholders. As I detailed in my cover story on McClendon last fall, at the heart of Chesapeake's operation is the land machine, which scoops up promising acreage across America, paying billions to secure the rights to drill. Much of that land turns out to have oil and gas; some doesn't. When land turns out not to be worth drilling, the millions sunk into accumulating it is lost.
>
> Chesapeake only drills wells on land where it has a good belief that there's oil and gas to be had. It drills more wells in the choicest parts of a field. ***McClendon only***

*participates in the good acreage; he doesn't get docked for the bad acreage Chesapeake has no use for. Thus he is absolutely guaranteed to get better opportunities and better returns than Chesapeake's shareholders. He shares in the boons and avoids the banes.*

55.     Accordingly, defendant McClendon is directly receiving a benefit not shared with shareholders because defendant McClendon is entitled to receive 2.5 percent of the proceeds from all of the successful wells.  However, McClendon (unlike shareholders) does not have to front the costs or incur the risks of potentially digging up a "dry" well.  As the *Forbes* article succinctly stated "*[h]e shares in the boons and avoids the bains*."

56.     The April 19, 2012 *Forbes* article likewise noted that in light of Chesapeake's severely constrained capital position (as a result of defendant McClendon's stewardship), defendant McClendon is actually directly competing with the Company for access to the capital markets in order to shore up his own finances, without telling shareholders the extent of his financings.  As the article stated:

> Doesn't he owe it to shareholders to put their capital needs ahead of his own? Shouldn't shareholders know that the ceo of their company has found someone to lend him $1.1 billion against assets that they co-own with him? That's an amount of money that is certainly material to a company with an equity market cap of $12 billion and debt load of $10 billion. ***This is an obvious conflict of interest, insufficiently disclosed, that should not be allowed to continue.***

57.     Predictably, the financial press has, by and large, not been kind to Chesapeake in light of these loans and the Board's immediate defense of defendant McClendon.  For instance, an April 18, 2012 *Reuters* article entitled "Chesapeake Shares Tumble on CEO Loan Worries" stated, in pertinent part:

> Shares of Chesapeake Energy Corp (CHK.N) dropped more than 5 percent on Wednesday and one investor called for the company to "clean up" its leadership after a Reuters report that Chief Executive Aubrey McClendon borrowed as much as $1.1 billion against his stake in thousands of company wells.
>
> Those loans, taken out over the past three years, were previously undisclosed to shareholders, analysts and academics said, and raised worries about the potential for conflict of interest. McClendon and the company insist there is no conflict.

Jittery investors pushed the company's shares down more than 10 percent to a low of $17.17, the lowest level since July 2009, before they rebounded to close down 5.5 percent at $18.06.

Trading in the company, the nation's second-largest natural gas producer behind Exxon Mobil Corp (XOM.N), was heavy, with 93.2 million shares changing hands. That was the highest level since October 10, 2008, the end of a week when McClendon was forced by margin calls to sell more than 31 million shares in the company.

"***Chesapeake is one of the leaders in this (sector), but his business ethics are out of the Wild West***," said David Dreman, chairman of Dreman Value Management LLP, which owns about 1 million shares of the company.

Dreman said the report of the new loans rekindled fears that had surfaced in 2008 around McClendon's stock sales.

"***I think the company has to be more professional," Dreman said. "I think that the whole management and the board of directors has to be cleaned up. We're obviously very unhappy with the situation as it is now***."

Chesapeake said the program that granted McClendon a 2.5 percent stake in its oil and gas wells had long been public.

"We respectfully disagree and reiterate that the program has been in place for 20 years and was strongly endorsed by a vote of our shareholders in 2005," spokesman Michael Kehs said in an email.

Another investor, who declined to be named, citing company policy, said he believed Wednesday's drop was caused by short sellers, and that he could add to the 5,000 shares in his portfolio.

"For me, it's more of a buying opportunity," he said.

\*       \*       \*

The news threatens to "put a cloud" over the company's planned initial public offering of its oilfield services unit, Brean Murray analyst Ray Deacon said.

Chesapeake wants to raise up to $862.5 million from the IPO, announced on Monday.

"Now that loan documents are made public, it just adds another layer of complexity to an already opaque corporate web," Deacon said.

'WHERE THERE IS SMOKE, THERE MAY BE FIRE'

As quoted in the Reuters story, McClendon and Chesapeake said the loans did not pose any conflict of interest. The loans are private transactions that the company has no responsibility to disclose or to vet, Chesapeake said.

"There are no covenants or obligations in my loan documents or mortgages that bind Chesapeake in any way," McClendon wrote in an email to Reuters.

But traders appeared to be erring on the side of caution.

"I think where there is smoke, there may be fire, and investors are still in a shoot-first mentality," said David Lutz, a trader a Stifel Nicolaus in Baltimore.

58.    Likewise, a *Seeking Alpha* article dated April 19, 2012 entitled "Chesapeake Response to CEO Loan Scandal is Lacking" noted that because the "collateral" for the loans needed for the wells was actually the 2.5 percent interest in wells, then defendant McClendon was incurring no risk whatsoever because if the wells were not producing enough for McClendon to cover his payments on the loans then the only thing McClendon would lose is his 2.5 percent stake in said non-producing well.  The article likewise noted that because defendant McClendon incurred essentially zero risk in a failed well that he was incentivized to drill as many wells as possible (as the Company has done over the past three years), regardless of whether they were in the Company's interest or not:

> As I wrote in a previous article, from FY 2006 to FY 2010, McClendon oversaw 15% average annual equity dilution. *Of course, even as shareholders' interests in these assets were being diluted, McClendon's 2.5% stake in the FWPP wells remained whole. During this same period, the company zealously, perhaps even recklessly, engaged in a leasing and drilling campaign with 2.5% of each new well becoming another personal asset McClendon could profit from at little financial risk to himself.* That this expansion was financed in no small part by diluting shareholders presents an obvious conflict of interest.

> Why has Chesapeake been so adamant about drilling in the last few years, even when it lacked a decent financial safety net and gas prices tanked? *Since McClendon can borrow against his FWPP stakes basically risk-free -- remember, the stakes serve as collateral so McClendon would simply lose his interest in wells he never paid for, not unlike an underwater homeowner walking away from a non-recourse, interest-only home mortgage -- it becomes clear the more wells CHK drills, the better for McClendon's personal portfolio even if it jeopardizes the company's financial stability, not to mention shareholder interests.*

> In this light, Chesapeake's incessant need to drill and monetize only to find new plays to drill and monetize could easily be construed as a CEO's attempt to enrich himself, even at the expense of shareholders. Frankly, McClendon has lost the benefit of the doubt and investors may be prudent to assume his personal profit motives may be primary over his corporate duties. After all, we're talking about $1.1B, a heady sum even for today's overpaid CEOs.

> The whole point of the FWPP was to further align McClendon's interests with shareholders, partly by forcing the CEO to buy in his 2.5% stake, even paying for

capital expenses upon invoicing, unlike JV partners. But deft old Aubrey managed to neatly sidestep the pesky inconvenience of having to actually put any money in by taking out the controversial loans in question.

By mortgaging his FWPP stake, McClendon perverted an already overly generous incentive program designed to further align his interests with shareholders into a lucrative, risk-free perk worth apparently $1.1B to date. This dynamic is laid out in the same Pittsburgh Post-Gazette article linked to in the Chesapeake response:

*It's a win-win situation for Mr. McClendon: Drill a profitable well, and the loan is easily paid off and well profits go to Oklahoma City-based Chesapeake. If the well doesn't produce or isn't drilled, the only collateral jeopardized is oil and gas interests...*

While Chesapeake's public response was needed, it ultimately fails in what I would assume to be its main purpose: easing investor concern. In fact, the defensive and disagreeable tone along with the lack of details regarding the actual issue at the heart of the story -- McClendon's loans -- only serve to reinforce the image of a self-serving corporate management that only pays lip service to caring about its shareholders.

At this point, McClendon can no longer hide behind the cover of personal privacy but must address this issue head-on and with full transparency. *Perhaps even something good, like a new CEO or a truly independent Board, may come out of this.*

59.     Critically, as a result of defendant McClendon's illicit loan scheme, the upgrade of the Company's credit rating is now in question.  In particular, an April 20, 2012 *Bloomberg* article entitled "Chesapeake CEO Loans Block Upgrade Aspiration:  Corporate Finance" states that the "[t]he 'loan scandal' has 'severely tainted the company.'"  Further, the article states that "*The complexity and the way they structure some of their transactions will work against them when they are seeking investment-grade*."  Accordingly, it is clear that the Company has been directly damaged as a result of defendant McClendon's actions.  The article stated, in pertinent part:

Chesapeake CEO Loans Block Upgrade Aspiration: Corporate Finance

Chesapeake Energy Corp. (CHK) Chief Executive Officer Aubrey McClendon says the second-largest U.S. gas producer is on track to be in investment-grade shape by the end of this year. The bond market is pointing the opposite way.

Credit-default swaps tied to the Oklahoma City-based company's debt surged to levels that imply it should only be rated B2, according to Moody's Corp.'s capital markets research group. Moody's Investors Service rates Chesapeake Energy

senior unsecured debt Ba3, and Standard & Poor's has it one step higher, BB+. The company had $10.6 billion of long-term debt at the end of last year.

The swaps soared this week after reports that McClendon, a company co-founder, has been using his personal 2.5 percent stakes in some Chesapeake Energy wells as collateral for loans that weren't fully disclosed to shareholders. Credit markets are built upon trust between lenders and borrowers, and the jump in the swaps suggest that link may be breaking down for Chesapeake Energy.

The "loan scandal" has "severely tainted the company," according to Marc Gross, a money manager at RS Investments in New York who oversees $3 billion in fixed-income funds, including Chesapeake Energy bonds. "There is no chance of an IG rating" over the next three years, he said. Chesapeake Energy is "more likely to get downgraded than upgraded," and the investment-grade goal "shows that they are out of touch with reality," he said.

Jim Gipson, a spokesman for Chesapeake Energy, declined immediate comment.

'Materially Improve'

While Chesapeake Energy is seeking investment-grade metrics by year-end, a rating reflecting that may take several years, McClendon said April 18 during an Independent Petroleum Association of America investment conference in New York. The company's $10.6 billion in debt is down from $12.6 billion at the end of 2010, according to data compiled by Bloomberg.

Peter Speer and Steven Wood, Moody's analysts, wrote in a Feb. 13 note that for its corporate family rating to qualify for an upgrade to Ba1, the highest non-investment level, from its current Ba2, Chesapeake Energy's leverage will have to decline from Dec. 31 levels and liquidity will have to "materially improve" with reduced reliance on asset sales. The company's leverage as measured by debt to earnings before interest, taxes, depreciation and amortization ratio was 2.03, Bloomberg data show.

Credit-default swaps tied to Chesapeake Energy surged to the highest since October 2009 on April 18 after Reuters reported this week that the structure of McClendon's personal loans wasn't fully disclosed to shareholders and created potential conflicts of interest.

Never High-Grade

Swaps have never signaled the company should be considered high grade, according to Moody's data that goes back to January 1999.

Credit-default swaps tied to Chesapeake Energy reached 4.9 percent upfront, according to prices from data provider CMA, which is owned by CME Group Inc. and compiles prices quoted by dealers in the privately negotiated market. That's in addition to 5 percent a year, meaning it would cost $490,000 initially and $500,000 annually to protect $10 million of Chesapeake Energy's debt.

Credit swaps pay the buyer face value if a borrower fails to meet its obligations, less the value of the defaulted debt.

Chesapeake Energy's $1.3 billion of 6.775 percent notes due March 2019 fell to 97 cents on the dollar from 100.75 on Feb. 24, to yield 7.33 percent at 11:21 a.m. in New York, according to Trace, the bond-price reporting system of the Financial Industry Regulatory Authority.

Lowered Outlook

The company's bonds on average yield 6.79 percent as of yesterday, closer to the 6.99 percent of all junk-rated energy companies than the 3.6 percent of those in the investment-grade sector, according to Bank of America Merrill Lynch index data.

Shares of Chesapeake Energy, which is smaller only than Irving, Texas-based Exxon Mobil Corp. among U.S. gas producers, fell to $18 yesterday, down 9.8 percent for the week. The shares have dropped 19 percent this year through yesterday. The shares declined 0.9 percent to $17.83 as of 11:56 a.m. in New York.

Moody's lowered its outlook on Chesapeake Energy to "stable" from "positive" on Feb. 13, citing weakening natural gas prices and the company's capital expenditure plans outpacing cash flow, meaning it would need to sell more assets or tap capital markets.

Chesapeake Energy plans to issue shares in its hydraulic- fracturing business unit Chesapeake Oilfield Services Inc. to raise $862.5 million to repay debt, make a cash distribution to its parent company and for general corporate purposes, according to a prospectus filed April 16.

Personal Finances

Although McClendon's personal finances won't factor into debt analysts' calculations, *credit-rating firms are wary of the company's debt load and its penchant for using forward commodity sales to raise cash for drilling*, said Scott Hanold of RBC Capital Markets LLC.

*"The complexity and the way they structure some of their transactions will work against them when they are seeking investment-grade,"* Hanold, an equity analyst with a rating the equivalent of "hold" on the shares, said in a telephone interview from Minneapolis. "I'm not sure the credit-rating agencies see these things the same way Chesapeake does."

The company has raised $6.4 billion since December 2007 through a series of so-called volumetric production payments, or VPPs, that require Chesapeake Energy to deliver a certain amount of gas or oil over a given period of time, in exchange for up- front cash. In the most recent transaction, Chesapeake agreed to sell Morgan Stanley 10 years of future gas output from a geological formation known as the Granite Wash for about $745 million, according to an April 9 statement.

'There Is Fire'

"The credit-rating agencies regard these VPPs as off- balance sheet debt," Hanold said. "The VPPs are a form of leverage that has to be taken into consideration."

Shareholders are protected if McClendon, Chesapeake's 52- year-old co-founder and chairman, defaults because the company holds first liens, an overriding claim, to the oil and gas that flows from the wells he used for collateral, General Counsel Henry J. Hood said April 18.

"Since Chesapeake is not a party to the loan documents, the liens and provisions do not reach Chesapeake's intangible assets," Hood said in an e-mailed statement. McClendon has had the right to buy stakes in Chesapeake wells since 1993, in an arrangement which requires the CEO personally to pay a proportionate share of drilling costs on those wells, Hood said.

McClendon ranks 359th on Forbes magazine's current list of wealthiest Americans, with a net worth of $1.1 billion.

"At the very least this highlights weak corporate governance," Gross said. "Worst case is there is an ongoing series of revelations that highlight a major breach in fiduciary duty. Sometimes when there is smoke there is fire."

60.    While the Board admitted on April 19, 2012 that it was "fully aware of the existence of Mr. McClendon's financing transactions,"  the Board completely changed its story on April 26, 2012, claiming that it "did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions."

61.    Accordingly, it is clear that from at least 2009 to the present (in light of the Board's failure to disclose highly-material information concerning defendant McClendon's loans, which present a direct conflict of interest between McClendon, the Company, and its shareholders), Defendants simply are unwilling to comply with their fiduciary duties; they will not manage the Company for the benefit of 99% of its shareholders, nor will they truthfully, completely and candidly disclose material information to the Company shareholders.  Thus, as a result of Defendants' multiple breaches of duties, the Company has been damaged, and it is subject to further, material damages if the Board determines to impermissibly bail out McClendon once again.

62.    In connection with the activities described, *supra*, Chesapeake is now being investigated by the SEC and the IRS.  On April 26, 2012, the defendants caused Chesapeake to announce that it "does not intend to extend the company's Founder Well Participation Program

… beyond its present 10-year term ending December 31, 2015."

63.     On or about May 1, 2012, it was announced that defendant McClendon would relinquish his role as Chesapeake's Chairman, but would remain as the Company's CEO.

## DEFENDANTS CAUSED CHESAPEAKE TO ISSUE THE MATERIALLY FALSE AND MISLEADING PROXIES

64.     During the Relevant Period, Defendants caused Chesapeake to disseminate to shareholders the following Proxy Statements in connection with the Company's annual shareholder meetings: a Proxy Statement filed with the SEC on Form DEF 14A on April 30, 2010 (the "2010 Proxy"); and the 2011 Proxy. Collectively, 2010 Proxy and 2011 Proxy shall be referred to as the "Proxies." Defendants drafted, approved, reviewed and/or signed the Proxies before they were filed with the SEC and disseminated to Chesapeake shareholders. Defendants knew, or were deliberately reckless in not knowing, that the Proxies were materially false and misleading.

65.     In particular, in the Proxies, the Board failed to disclose any meaningful details whatsoever about defendant McClendon's illicit transactions. The Proxies failed to disclose (among other things) McClendon's lenders, the size of each obligation, or their terms. The Proxies never indicated that McClendon has taken advantage of his relationship with the Company's creditors for his personal financial benefit, nor did they disclose that because of McClendon's scheme, he is in violation of the Founders Program, because he incurs none of the risk exposed to the Company.

## DERIVATIVE AND DEMAND ALLEGATIONS

66.     Plaintiff incorporates the above-referenced paragraphs as if fully set forth herein.

67.     Plaintiff brings this action derivatively on behalf of Chesapeake to redress injuries suffered, and yet to be suffered, by the Company as a direct and proximate result of Defendants'

breaches of fiduciary duty and other violations of law.

68.     Plaintiff is a current holder of Chesapeake common stock and will adequately represent the interests of the Company in this litigation.   Plaintiff has retained counsel experienced in litigating this type of action.

69.     Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

a.   Demand is excused because of Defendants' swift and unequivocal public defense of defendant McClendon's illicit transactions discussed herein.   In particular, a day after the *Reuters* Article was published, Defendants vehemently defended defendant McClendon's actions and steadfastly concluded that there were no violations of law or other conflicts of interest. Defendants likewise defended their public disclosures and claimed that they did not omit any material information.   Critically, Defendants issued these blanket denials without the benefit of any form of an internal investigation. Further, Defendants completely changed their story on April 26, 2012, claiming that they "did not review, approve or have knowledge of the specific transactions engaged in by Mr. McClendon or the terms of those transactions."   Accordingly, a reasonable stockholder would not believe, based on Defendants' blanket denial of wrongdoing (and previous history of "omitting" material facts) and subsequent reversal of their story, that the Board would have been able to properly and impartially consider a pre-suit demand in good faith.   Thus, demand is excused.

b.   Every member of the Board was aware of, or should have been aware of,

numerous red flags regarding their failure to issue full and complete disclosures. Despite clearly being placed on notice of illicit practices, Defendants consciously disregarded their fiduciary duties to Chesapeake when, under their direction, the Company continued to issue false and misleading disclosures, which omitted material information concerning defendant McClendon's loans.

c. Based on the facts alleged herein, every director on the Board is either interested in a demand, or has engaged in conduct which is not presumptively protected by the business judgment rule, or, at the least, there is doubt that their conduct is protected by the business judgment rule, including, but not limited to, their conduct relating to their management and oversight of the Company and/or their disclosures or omissions related to the underlying conduct alleged herein;

d. During the Relevant Period, defendants Davidson, Hargis and Miller served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, reviewing Chesapeake's SEC filings prior to their issuance, and reviewing any major issues as to the adequacy of the Company's internal controls. Defendants Davidson, Hargis and Miller breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed the material omissions concerning defendant McClendon's loans (which they admittedly were aware of) to go unpublished in any of the Company's SEC filings. Therefore, defendants Davidson, Hargis and Miller

face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile; and

e.   The principal professional occupation of defendant McClendon is his employment with Chesapeake as its CEO and President, pursuant to which he has received and continues to receive substantial monetary compensations and other benefits.   In addition, Defendants have admitted in the Company's Annual Proxy Statement filed with the SEC and disseminated to shareholders on April 29, 2011 that defendant McClendon is not independent.   Thus, defendant McClendon lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action.

**COUNT I**
**AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION**

70.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

71.    As alleged in detail herein, each of the Defendants (and particularly the Audit Committee Defendants) had a duty to ensure that Chesapeake disseminated accurate, truthful and complete information to its shareholders.

72.    Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to Chesapeake shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein.   These actions could not have been a good faith exercise of prudent business judgment.

73.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

74.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

75.     Defendants owed and owe Chesapeake fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe Chesapeake the highest obligation of good faith, fair dealing, loyalty and due care.

76.     Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

77.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Chesapeake has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

78.     As a result of the misconduct alleged herein, Defendants are liable to the Company.

79.     Plaintiff, on behalf of Chesapeake, has no adequate remedy at law.

## COUNT III
### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

80.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

81.     As alleged herein, each of the Defendants (and particularly the Audit Committee Defendants) had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on

notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

82.     Defendants willfully ignored the obvious and pervasive problems with Chesapeake's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

83.     As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

## COUNT IV
## AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT

84.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

85.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Chesapeake.

86.     Plaintiff, as a shareholder and representative of Chesapeake, seeks restitution from these Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## COUNT V
## AGAINST ALL DEFENDANTS FOR GROSS MISMANAGEMENT

87.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

88.     Defendants had a duty to Chesapeake and its shareholders to prudently supervise, manage and control the operations, business and internal financial accounting and disclosure controls of Chesapeake.

89.     Defendants, by their actions and by engaging in the wrongdoing described herein,

abandoned and abdicated their responsibilities and duties with regard to prudently managing the businesses of Chesapeake in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, Defendants breached their duties of due care, diligence and candor in the management and administration of Chesapeake's affairs and in the use and preservation of Chesapeake's assets.

90.     During the course of the discharge of their duties, Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet Defendants caused Chesapeake to engage in the scheme complained of herein which they knew had an unreasonable risk of damage to Chesapeake, thus breaching their duties to the Company.  As a result, Defendants grossly mismanaged Chesapeake.

## COUNT VI
## AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

91.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

92.     Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. §240.14a-9.  Specifically, the Proxies violated §14(a) and Rule 14a-9 because they omitted material facts regarding McClendon's illicit transactions and violations of the Founder's Program.

93.     The Proxies were false and misleading when issued because they failed to disclose (among other things) McClendon's lenders, the size of each obligation, or their terms.

The Proxies never indicated that McClendon has taken advantage of his relationship with the Company's creditors for his personal financial benefit, nor did they disclose that because of McClendon's scheme, he is in violation of the Founders Program, because he incurs none of the risk exposed to the Company.

94.     In the exercise of reasonable care, Defendants should have known that the statements contained in the Proxies were materially false and misleading.

95.     The misrepresentations and omissions in the Proxies were material to Chesapeake shareholders in voting on the Proxies.  The Proxies were an essential link in the accomplishment of the continuation of Defendants' continued violation of their fiduciary duties in connection with McClendon's illicit transactions and violations of the Founder's Program.

96.     The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the Proxies.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing Chesapeake to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's

supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.     Awarding to Chesapeake restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Submitted this 2nd day of May, 2012.

By: s/Steven W. Crow
LAW OFFICES OF DELLUOMO & CROW
5617 N. Classen Blvd.
Oklahoma City, OK 73118
405-843-0400
405-843-5005 (fax)

ROBERT I. HARWOOD
MATTHEW M. HOUSTON
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY 10022
(212) 935-7400

Attorneys for The David A. Kroll, Inc.
Employees' Profit-Sharing Plan And Trust